**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **M.C, by and through his Mother,** | : | |
| **MARIE CONYERS,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | **No. 19-520** |
| | : | |
| **v.** | : | |
| | : | |
| **THE SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA,** | : | |
| | : | |
| **Defendant.** | : | |

**McHugh, J.**                                                   **August 20, 2020**

## MEMORANDUM

Under the Individuals with Disabilities Education Act (IDEA) school districts have an obligation to provide students within their jurisdiction with a "free appropriate public education," also known as a FAPE. For students with special needs this includes the responsibility to formulate an Individual Education Program (IEP). The responsibility to offer an IEP extends to students who are homeschooled, or in private schools, if a formal request for evaluation is properly submitted to the child's home school district.

Plaintiff here contends that the School District of Philadelphia failed to meet its obligations to her child, M.C., during the 2017-18 and 2018-19 schoolyears. Central to the dispute is when the School District's duty to perform a formal evaluation arose, which in turn depends upon when Plaintiff clearly requested an evaluation for M.C. In this case, an Independent Hearing Officer for the Pennsylvania Office for Dispute Resolution concluded that the School District acted in a timely fashion once it was properly requested to perform an evaluation and created a plan sufficient to provide M.C. with an appropriate education for the

schoolyears in question.  For the reasons that follow, the Hearing Officer's decision will be affirmed.

## I.     Relevant Background

### A.  Schoolyears 2008-09 to 2016-17—M.C.'s Early Schooling

M.C. is a seventeen-year-old student with special needs who has resided in the School District of Philadelphia since 2008.  Sometime during the 2011-12 schoolyear, the School District evaluated M.C. and concluded that he qualified as a student with a disability. Compl. ¶ 11, ECF 1.  Since then, M.C. has had an IEP.  *Id.*

M.C. began attending school in the School District in September 2008, his kindergarten year.  Compl. ¶ 8.  M.C. attended various schools in the School District between the 2008-09 and 2014-15 schoolyear.  Compl. ¶ 20.  In the 2015-16 and the 2016-17 schoolyears, other than a brief period in which he reenrolled in the School District, M.C. was homeschooled.  Compl. ¶¶ 21, 22; *see also* ECF 34, at 4.  While homeschooled, M.C. also received supplemental educational programming from the Natural Creativity Center (NCC), a private, community-based resource for homeschooled children.  Compl. ¶ 22.

### B.  September 2016—Parties' IDEA Settlement

In September 2016, the parties executed a Settlement Agreement that addressed certain aspects of M.C.'s education and the School District's responsibility to provide for it.  The Settlement Agreement generally released the School District from all claims "from the beginning of time up through the last day of the Extended School Year, 2017."  Settlement Agreement ¶ 1. Specifically, the parties agreed that the Settlement Agreement would resolve all claims that M.C.'s mother could bring under the IDEA, its implementing regulations, and the Pennsylvania equivalents.  *Id.* ¶ 2.

2

In exchange for the release of claims, the School District provided M.C. a compensatory education fund with which he could purchase "appropriate and legitimate educational, vocational training/services, therapeutic and/or remedial instruction, programs, courses, services and materials," as well as certain technology like "reasonably priced computers, printers and educational software."  Settlement Agreement ¶ 4.B.  The Settlement Agreement also allowed for the compensatory education fund to be used for "tuition/services at the Natural Creativity Center" and "transportation to/from the Natural Creativity Center."  *Id.*  That compensatory education fund will be available to M.C. until 2023, when he turns twenty-one.

In addition to generally releasing and discharging the School District from legal claims, the Settlement Agreement contains five additional provisions relevant here.

### 1. M.C.'s mother specifically discharged the School District of certain prospective educational responsibilities.

Through the Settlement Agreement, M.C.'s mother "discharged" the School District of "total responsibility . . . for the provision of educational programming for [M.C.] under state and federal law . . . during the 2016-2017 School Year, including the Extended School Year, 2017." *Id.* ¶ 4.D.  M.C.'s mother also "agree[d] that the District is released of its liability to provide [M.C.] a FAPE during the 2016-2017 School Year, and the Extended School Year, 2017."  *Id.*

### 2. The Parties agreed to meet to discuss M.C.'s progress.

In that same paragraph, the parties also agreed to the process by which they would review M.C.'s progress as a homeschooled student and "discuss future programming."  Specifically, the "Parties agree[d] to meet not later than April 14, 2017 to review [M.C.'s] attendance, progress and educational growth at the Natural Creativity Center during the 2016-2017 School Year, and to discuss future programming."  *Id.*

3

### 3. *M.C.'s mother agreed to a process for reenrolling M.C. in the School District.*

In addition to agreeing to meet to discuss M.C.'s "future programming," the Settlement Agreement described the process M.C.'s mother would have to follow if she planned to reenroll M.C. in a School District school.  Specifically, "[M.C.'s mother] further agrees that should she wish to re-enroll [M.C.] in a District program, she will notify the Deputy Chief of the Office of Specialized Services, 440 N. Broad Street, 2nd Floor, Philadelphia, PA 19130-4015, in writing, not less than ninety (90) days prior to [M.C.'s] re-enrollment."  *Id.*

### 4. *The scope and legal significance of the agreement was explicitly limited.*

Through the Settlement Agreement, the parties made clear that "[n]othing in this Agreement shall constitute nor be construed as an acknowledgment by the District that any of the educational programs, services, materials or equipment for which payment or reimbursement is made pursuant to the terms of this Agreement constitute part of a free appropriate public education for [M.C.], nor establish an interest in the continued provision of such programs, services, materials or equipment beyond the time at which the provider thereof is unwilling or unable to continue or the funds available therefore under the terms of this Agreement are exhausted."  *Id.* ¶ 6.

### 5. *The Settlement Agreement was collaboratively drafted and constituted the entire understanding of the parties.*

The Settlement Agreement noted that "there are no written or oral understandings or agreements directly or indirectly connected with this Agreement that are not incorporated herein."  *Id.*  Further, because the Settlement Agreement was "drafted jointly," the parties agreed that "there shall be no presumption of construction against any Party."  The Settlement Agreement even included a rule of construction.  It noted that the "language of all parts of this

Agreement shall be construed as a whole, according to the fair meaning, and not strictly for or against any Party." *Id.* ¶ 9.B.  Finally, the parties acknowledged that the "terms of this Agreement have been completely read, considered and understood by the Parties, who have had a reasonable opportunity to consult with legal counsel of their choice prior to execution." *Id.* ¶ 9.D.

### C.  Spring and Summer 2017—Due Process Complaint

What happened during the schoolyear that followed is contested by the parties. According to M.C.'s mother, in April and May 2017, her former counsel "repeatedly" contacted outside counsel for the School District to arrange a meeting to review M.C.'s educational progress during the 2016-17 schoolyear, and to discuss future programming.  ECF 35, at 8-9.  In a certified letter sent on May 4, 2017, counsel for M.C.'s mother stated that he "sent [School District's counsel] an e-mail on April 3, 2017 and left [that counsel] telephone messages on April 26, 2017 and May 3, 2017, but there has been no return communication."  M.C.'s mother's counsel then cited the 2016 Settlement Agreement, stating,

> As you may recall, there exists a Settlement Agreement among the parties which expires at the end of this Summer, and which provides . . .
>
> > "The Parties agree to meet not later than April 14, 2017, to review [M.C.'s] attendance, progress and educational growth at the Natural Creativity Center during the 2016-2017 School Year, and to discuss future programming."

ECF 35, at 8-9 (citing Settlement Agreement ¶ 4.D).  M.C.'s mother contends that even though "counsel did not specifically use the term 'IEP' in the May 4, 2017 letter," the letter should have served as notification to the School District "that M.C. would be returning to the District and required a re-evaluation and an updated IEP."  Compl. ¶ 29; *see also* ECF 35, at 14 n.12 (arguing that Court should reject any contention that "she never requested an IEP" even though in the

letter "counsel did not specifically use the term 'IEP'").  According to M.C.'s mother, because her "[f]ormer counsel asked for a meeting to develop 'future programming,'" as that term had been employed in the Settlement Agreement, a request for a reevaluation of M.C. and a revised IEP clearly was implied.  *Id.*

After these communications, the parties did not meaningfully communicate again until August 2017.  On August 1, M.C.'s mother submitted an affidavit declaring her intent to homeschool M.C. for the 2017-18 schoolyear.  *See* Pennsylvania Special Education Hearing Officer's Final Decision and Order, ODR No. 20659-1718, at 6 (Nov. 7, 2018), ECF 16-13 (hereinafter Hearing Officer Decision).  Following that, on August 30, 2017, M.C.'s mother filed a due process complaint against the School District alleging that it had not offered M.C. a timely, appropriate IEP for the 2017-18 schoolyear.  *See id.*

The August Complaint included various claims and sought reimbursement for services M.C. was receiving as part of a homeschooling program.  *Id.* at 3.  The parties also agree that the August Complaint included a specific request for the School District to reevaluate M.C.  ECF 34, at 5 (School District noting that "Plaintiff filed for due process while also requesting an IEP meeting by letter to the District"); ECF 35, at 4 (Plaintiff noting that "The August 30, 2017 complaint included a request for the District to evaluate M.C.").

**D.  Fall and Winter 2017—IEP Meeting and Reevaluations of M.C.**

The parties communicated again in late September 2017.  On September 25, in response to the August Complaint filed by M.C.'s mother and her request for a reevaluation of M.C., the School District sought permission to reevaluate M.C. and proposed an IEP meeting to discuss potential programming in the District.  The School District also issued to M.C.'s mother a copy of a draft IEP.  Compl. ¶ 37; Answer ¶ 37; ECF 34, at 6.

6

The parties subsequently met on October 19 and revised the draft IEP.  The Hearing

Officer found that the October 2017 IEP:

- "contained present levels of academic and functional performance from a June 2016 re-evaluation when [M.C.] had briefly returned to the District in the midst of multiple years of homeschooling."
- "includes ten goals, including three goals in reading, two goals in mathematics, one goal in attention/task-completion, one goal in organization, and three goals in post-secondary transition/career exploration/independent living."
- "calls for counseling services 30 minutes per month."
- "recommends that [M.C.] is eligible for extended school year programming in the summer for reading, mathematics, and behavior support."
- "recommends that [M.C.] receive instruction for two hours per day in a learning support and one hour per day in an autism support."
- "recommends that [M.C.] attend the District high school [M.C.] would attend if [M.C.] did not have a disability and that [M.C.] spend 57% of the school day in the regular education setting."
- "was seen as interim programming, to be implemented for 30 days upon [M.C.'s] return to the District, whereupon it would be revised as the District began to work with [M.C.], as well as in light of the District's re-evaluation."

Hearing Officer Decision, at 7.

Sometime after the October 19 IEP meeting, M.C.'s mother provided her consent to have

M.C. reevaluated.  ECF 37, at 3-4.  In November 2017, M.C. was independently evaluated by a

developmental psychologist.  Compl. ¶ 44.  The report contained a detailed review of M.C.'s

education history and record.  It contained an assessment of M.C.'s academic skills, an

assessment done by M.C.'s mother of M.C.'s response to various social situations, and a

behavioral assessment and transition assessment.  In the evaluation, the psychologist noted her

concerns with M.C.'s vocational understanding, emotional regulation, socialization in crowds,

and the need for support in reading and mathematics.  The report recommended that M.C. remain

in his current homeschooling arrangement or, if he was unable to, that he switch to another

private school setting.

The November 2017 report also included recommendations for a potential placement in a public-school environment, including a gradual transition to such an environment, with particular attention paid to how M.C. could engage crowded or noisy environments, like hallways or the cafeteria.  Hearing Officer Decision, at 8.  Nevertheless, the psychologist recommended any public-school placement be in a "small, structured, supervised school environment."  *Id.* (internal citation omitted).

In December 2017, the School District issued its own reevaluation report.  That report included the results of multiple prior evaluations of M.C., most of which were privately obtained or obtained as part of medical evaluations.  The School District's report also contained updated assessments by the District's evaluator, including cognitive, achievement, behavioral, anxiety, executive functioning, and autism spectrum assessments.  *Id.* at 9.  It identified M.C. as a student with an emotional disturbance, specific learning disabilities, and autism.  *Id.*

The School District's evaluator noted, "Should [M.C.] return to a traditional school setting (from homeschooling), [M.C.'s] need for specially designed instruction appears clear. . . . educational planning and progress should be closely monitored to ensure [M.C.] makes appropriate progress."  *Id.* (internal citation omitted) (ellipses in original).  The evaluator lauded M.C.'s progress—including certain "recent accomplishments and recent courage."  *Id.*  But the evaluator also found that "sudden abnormally high rates of fear or inhibition in particular situations such as loud, crowded hallways would impede functioning."  *Id.* (internal citations omitted).

The School District's evaluator recommended that M.C. reengage outside behavioral treatment and obtain a functional behavior assessment in a School District school.  It also recommended partnering any public-school attendance with school-based counseling and autism

support, along with social engagement skill development. Finally, the School District's

evaluator recommended that M.C.'s instruction focus on support in reading and mathematics,

and strategies to address executive functioning, attention, and organization.

The School District's reevaluation report did not cause it to revise M.C.'s October 2017

IEP, and M.C. remained in homeschooling for the 2017-18 schoolyear.

### E.  December 2017 and June 2018—Due Process Hearings

Based on the August Complaint, the parties participated in a Due Process hearing on

December 20, 2017, at which M.C.'s mother testified. Sometime after the December hearing,

M.C.'s mother dismissed her former counsel and retained current counsel. On February 25,

2018, new counsel withdrew the August Complaint. Consequently, the Hearing Officer who had

presided over the December hearing never rendered a final decision, and there were no further

hearing sessions for the August Complaint.

In April 2018, M.C.'s mother filed a second Due Process Complaint, which is the

complaint now before this Court. The April Complaint focused on the same time frame as the

earlier complaint, the 2017-2018 schoolyear.  The prior procedural history between the parties

was not set forth in the new complaint, nor was it raised as part of the School District's response.

A first hearing was held in June 2018. When the Hearing Officer became aware of the prior

procedural history, and the fact that M.C.'s mother had previously testified, he limited M.C.'s

mother's testimony to the period after January 2018. Thereafter, the Hearing Officer reviewed

the transcript of the December 20, 2017, hearing, encompassing Plaintiff's testimony about

interactions between the parties starting in the Fall of 2017, up to the creation of the October

2017 IEP and the November 2017 reevaluation process.

Before the second hearing, in August 2018, the Hearing Officer concluded that M.C.'s mother had been given an adequate opportunity to develop an evidentiary record at the December 2017 hearing.  The Hearing Officer then admitted to the record evidence from that hearing, and further barred any other testimony relating to the events that occurred in Fall 2017.

Prior to convening the August 2018 session, the parties sought to resolve all issues but were unable to.  On August 24, 2018, the Hearing Officer issued an Interim Pendency Order, instructing the parties that should M.C. return to the School District, he should attend school at Sayre High School, as specified in the October 2017 IEP.  *See* ECF 36, at 4.  The Hearing Officer issued his final ruling in November 2018, finding that the School District had met its obligations to provide a free appropriate public education to M.C. under all applicable laws in its proposed programming for the 2017-18 and 2018-19 schoolyears, through the date of the decision.  *See* Hearing Officer Decision, at 10-17.

The Hearing Officer further ordered that M.C.'s IEP team must meet to revise M.C.'s IEP as the team deemed necessary or advisable.  He directed the IEP Team to "to consider the content of the November 2017 independent report, the December 2017 [reevaluation by the School District], and the results of the functional behavior assessment," as well as any other assessment or evaluation conducted.  *Id.* at 16.  The Hearing Officer also directed the IEP team "to garner specific input as to [M.C.'s] behavior and potential needs in hallways, the cafeteria, and other school-based situations involving crowds or noise."  *Id.*

### F.  January 2020—District Court Evidentiary Hearing

In a prior Memorandum and Order entered on July 31, 2019, I granted Plaintiff leave to supplement the record with additional evidence from M.C.'s mother,[1] *see* ECF 19, and in January 2020 I held an evidentiary hearing to supplement the record with testimony from M.C.'s mother.

## II.    Legal Framework

### A.  The standard of review for administrative proceedings

With that as background, both parties have moved for summary judgment on the administrative record, as supplemented by the January hearing before this Court.  When considering an appeal from a state administrative decision under the IDEA, the district courts apply a nontraditional standard of review, often referred to as "modified *de novo*" review.  *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).  Under the modified *de novo* standard, the district court may make its own evidentiary findings, but if it does so it "must make its own findings by a preponderance of the evidence."  *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

At the same time, however, the district court must give "due weight" to the findings of the state hearing officer.  *Id.*  Specifically,

> factual findings from the administrative proceedings are to be considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.  In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight.  This means that a district court must accept the state agency's credibility

---

[1] As one basis for review, Plaintiff contended that the Hearing Officer committed error in limiting her testimony. That basis for appeal has been mooted by the evidentiary hearing conducted.

determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.

*Id.* (cleaned up).

**B.  The IDEA and Section 504**

**1.  *The School District is generally obligated to provide FAPE to students in its jurisdiction.***

The IDEA is intended to ensure that every child with special needs is afforded a "free appropriate public education designed to meet [those] unique needs."  20 U.S.C. § 1400(d)(1)(A).  To accomplish that goal, Congress through the IDEA has established a "comprehensive . . . remedial scheme."  *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 803 (3d Cir. 2007) (en banc).  The law ensures the student is provided a free appropriate public education "by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide."  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

The cornerstone of a FAPE is a student's IEP.  "A school district provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan (IEP)."  *Id.* at 729-30 (internal quotations omitted).  Though an IEP may take many forms, it must be tailored to the student and "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  *Id.* (internal quotations omitted).

For students enrolled in public schools, "[t]he IDEA also requires that a state have a system in place to identify, locate, and evaluate all children in the state who have disabilities and need special education and related services."  *Id.* at 730.  This is known as the "Child Find"

12

requirement.  *See* 20 U.S.C. § 1412(a)(3).  Pursuant to this requirement, once a district suspects an enrolled child of having a disability, the district "must conduct an evaluation of the [child's] needs, assessing all areas of suspected disability, before providing special education and related services to the child."  *P.P.*, 585 F.3d at 730.

Section 504 of the Rehabilitation Act is quite similar.  Indeed, the Rehabilitation Act and the IDEA "do similar statutory work."  *Id.* at 735.  Under Section 504, recipients of federal funds must "provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33(a).  Section 504 "is parallel to the IDEA in its protection of disabled students:  it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements."  *P.P.*, 585 F.3d at 735.

Because "[t]he claims in this case made under § 504 are parallel to the IDEA claims," that is, because both claims concern the School District's alleged denial of FAPE, resolution of the IDEA issue will resolve the Section 504 issue as well.  *See id.* at 730.  Thus, my analysis will focus on the IDEA, and the resolution of the IDEA claim also will resolve the claim Plaintiff brings under Section 504.

### 2. *The School District has more limited obligations to students being educated outside public schools.*

"At the beginning of each school year, each local educational agency . . . shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program."  20 U.S.C. § 1414(d)(2)(A).  But "[i]f a student is enrolled at a private school because of a parent's unilateral decision [to wit, when a student is disenrolled from a public school and placed in a private school without the district's consent] the school district does not maintain an

obligation to provide an IEP." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Ed. of Mass.*, 471 U.S. 359, 365 (citing 20 U.S.C. § 1412(a)(10)(A)(i)); *see also D.P. ex rel. Maria P. v. Council Rock School Dist.*, 482 Fed. App'x 669, 672 (noting that 20 U.S.C. § 1412(a)(10)(A)(i) requires a school to provide "for such children special education and related services in accordance with [certain] requirements" but not an IEP).[2]

The governing federal regulation underscores this limitation: "No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 C.F.R. § 300.137; *see also I.H. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 772 (M.D. Pa. 2012).

Nevertheless, upon parental request, a school district must still provide *an offer* of a FAPE to each child with a disability in its jurisdiction. That is, even for a student with special needs who was unilaterally placed in a private school, a school district must, upon parental request, evaluate the student and develop for him an IEP. *A.B. through K.B. v. Abington School Dist.*, 2020 WL 1126298, at *4 (E.D. Pa. Feb. 24, 2020) (internal citation omitted). A school district which does not comply with such a request fails in its FAPE obligations, and thus violates the IDEA. *Id.*

A parent who has unilaterally enrolled their child in a private school is entitled to request a reevaluation of the child's IEP at any time, 20 U.S.C. § 1414(a)(2)(A)(ii), which a school district must complete within 60 calendar days, 22 Pa. Code § 14.124(b). A school district

---

[2] Here, it could be said that M.C. was in part educated at home, and in part at a private school. Regardless, I have no hesitation in concluding that IDEA extends to children entirely educated at home. *See Jalen Z. v. School Dist. of Philadelphia,* 104 F. Supp. 3d 660, 681 (E.D. Pa. 2015).

carries this obligation regardless of whether the child is enrolled in a school district school.  *See Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1077 (D.N.J. 2011).  Nevertheless, a school district's obligation to reevaluate a student is contingent on the parent's request.

### 3. *A parent must request her child's reevaluation clearly.*

In the Third Circuit, a parent's request for a reevaluation of a student's IEP must be made "clearly."  *See D.K. v. Abington School District*, 696 F.3d 233, 248 n.5 (citing 20 U.S.C. § 1415(d)(1)(A)(i)); *see also* 22 Pa. Code § 14.123(c) ("Parents may request an evaluation at any time, and the request must be in writing. . . . If a request is made orally to any professional employee or administrator of the school entity, that individual shall provide a copy of the permission to evaluate form to the parents within 10-calendar [sic] days of the oral request.").  However, "general expressions of concern" do not "constitute a 'parental request for evaluation.'"  *D.K.*, 696 F.3d at 248 n.5.  For practical purposes, whether the parent made a "request" for an evaluation or an IEP is the "the first question" a court must answer in determining whether a district violated its FAPE obligations by failing to propose a special education program for such a student.  *See Moorestown*, 811 F. Supp. 2d at 1067.

## III.  Discussion

At the August 2018 Due Process Hearing, the Hearing Officer heard testimony from witnesses for both parties.  He detailed his findings of fact and conclusions of law in a November 2018 order that denied M.C.'s mother's request for a ruling finding the School District denied her son a FAPE.  After correctly observing that M.C.'s status as a homeschooled student "does not impact the ability of the parent in the instant case to engage with the District in the potential provision of special education programming," the Hearing Officer reasoned that "here, the question turns on whether the District's educational programming, proposed through the October

2017 IEP, is reasonably calculated to provide significant learning to [M.C.] in light of [M.C.'s] unique circumstances." Hearing Officer Decision, at 11-12. The Hearing Officer concluded that "[t]he weight of the record supports a conclusion that the District has met its FAPE obligation to [M.C.]."

M.C.'s mother contends that the Hearing Officer erred in reaching that conclusion for two related reasons. First, M.C.'s mother argues that the School District's failure to plan for M.C.'s education or offer him an IEP *prior* to the start of the 2017-18 schoolyear violated the IDEA. Second, M.C.'s mother argues that, even if the October 2017 IEP was timely, it was "inappropriate and unsuitable for M.C.'s known educational needs." ECF 35, at 1. I will address each argument in turn.

### A. The School District was not required to reevaluate M.C. or offer him a new IEP until after M.C.'s mother explicitly requested an IEP meeting on August 30, 2017

As a parent who unilaterally removed her child from the School District, M.C.'s mother was "entitled to request a reevaluation" of M.C.'s IEP at any time. Under Pennsylvania law, "the reevaluation time line [is] 60-calendar days." 22 Pa. Code § 14.124(b). In establishing that timeline, however, Pennsylvania law "incorporated by reference" the requirements of 34 C.F.R. § 300.303, the regulation promulgated pursuant to the IDEA concerning student reevaluations. That federal regulation implements the reevaluation requirements of 20 U.S.C. § 1414(a)-(c). And those statutory provisions, in turn, clarify that the sixty-day timeline does not begin to run until the parent provides "informed consent." 20 U.S.C. § 1414(c)(3). Thus, to determine whether the School District timely completed its reevaluation depends on when M.C.'s mother provided the School District consent to reevaluate.

16

The parties agree that the August 30, 2017, Due Process Complaint filed by M.C.'s mother included a request for the School District to reevaluate M.C.  *See* ECF 34, at 5 ("Plaintiff filed for due process while also requesting an IEP meeting by letter to the District."); ECF 35, at 4 ("The August 30, 2017 complaint included a request for the District to evaluate M.C.").  The record also demonstrates that on September 25, the School District sent M.C.'s mother a permission form to reevaluate M.C. in accordance with the requirements of 34 CFR § 300.301(c)(1).  *See* Hearing Officer Decision, at 6.  Further, the School District points to evidence in the record demonstrating that M.C.'s mother did not provide informed consent for M.C.'s reevaluation until sometime after the parties' October 19 IEP meeting.  ECF 37, at 4.  Thus, because the School District completed its reevaluation and issued a report by December 19, M.C.'s reevaluation was completed within sixty days after M.C.'s mother provided informed consent.

M.C.'s mother contends that the School District had an obligation to have an IEP in place for M.C. by the beginning of the 2017-18 schoolyear.  But that overstates the District's responsibilities under the IDEA and under the parties' Settlement Agreement.  A school district maintains no preemptive obligation to design or implement an IEP for students unilaterally placed in private schooling.  The 2016 Settlement Agreement addressed M.C.'s educational placement and programming through the end of the summer of 2017.  Plaintiff did not give written notice to the District 90 days in advance of her intent to re-enroll M.C., as the agreement required.  And on August 1, 2017, M.C.'s mother signed a homeschooling affidavit, evidently communicating her intention to keep M.C. out of the School District and at NCC.  Consequently, it was not until M.C.'s mother gave her permission to the School District to reevaluate M.C. that the School District was obliged to program for M.C.

M.C.'s mother seems to contend that the April and May 2017 communications from her counsel to counsel for the School District triggered the School District's reevaluation obligations. But those communications did not "objectively manifest a desire" for the School District to reevaluate M.C.[3] The letter sent by counsel for M.C.'s mother chiefly sought to schedule a meeting with the School District to review M.C.'s progress at NCC "and to discuss future programming." The reference to "future programming" did not include a request to reevaluate M.C. or to revise his IEP.

Moreover, the reference to "future programming" was not even counsel's language—it was language pulled from the parties' 2016 Settlement Agreement, which covered the 2016-2017 schoolyear. Such a reference was not sufficient to trigger the School District's obligation to reevaluate M.C. *See D.K.*, 696 F.3d at 248 n.5 (concluding that even expressions of concern with specific requests do not "constitute a 'parental request for evaluation' under the plain terms of the statute"); *Durbrow v. Cobb County School District*, 887 F.3d 1182, 1193 (11th Cir. 2018) (concluding that parent's request for "help" or to "test [the child] for something" did not "amount to a parental request for an IDEA evaluation").

### B. The Hearing Officer's conclusion that the October 2017 IEP was "reasonably calculated" to facilitate M.C.'s progress is sound

Because the School District's December 2017 reevaluation was timely, I must now address whether the October 2017 IEP was "reasonably calculated" to ensure M.C.'s progress. *See* ECF 35, at 1. The Hearing Officer's decision examined in detail the adequacy of the

---

[3] It should also be noted that counsel for M.C.'s mother sent the May 2017 letter to the lawyers that had represented the School District in a previous due process matter. Those attorneys were not staff counsel at the District, but outside litigation counsel. The 2016 Settlement between the parties required M.C.'s mother to write to the Deputy Chief of the Officer of Specialized Services at the School District if "she wish[ed] to reenroll[M.C.] in a District program." Settlement Agreement ¶ 4.D.

October 2017 IEP and concluded it was "reasonably calculated to provide significant learning to [M.C.] in light of [M.C.'s] unique circumstances." Hearing Officer Decision, at 12. The governing standard requires me to give "due weight" to the Hearing Officer's factual findings, and to review any conclusions of law *de novo*. Following those standards, along with an independent review of the record and of the governing law, together with the supplemental testimony of M.C.'s mother, I conclude that the Hearing Officer's conclusions were correct.

As noted by the Hearing Officer, the October 2017 IEP included information on M.C.'s then-current academic and functional performance levels, and "included numerous goals in the areas of [M.C.'s] needs, and specially-designed instruction/program modifications for the delivery of special education, including monthly counseling." Hearing Officer Decision, at 13.

The IEP itself was detailed and wide-ranging in scope. Plaintiff's expert offers criticism of the plan, but it must be kept in mind that because M.C. had not been enrolled in the School District for some time, the District was heavily dependent upon information from M.C.'s mother and Mr. Bergson, the director of the Natural Creativity Center, which supported M.C.'s homeschooling. As an alternative school, the Natural Creativity Center did not issue report cards, did not engage in progress monitoring, and did not conduct any assessments, ECF 34, at 15 (citing due process hearing transcripts), limiting objective baselines available for review. M.C. himself was not at the meeting so the IEP team did not have an opportunity to interact with him directly. *Id.* at 6. The most recent academic data available was from M.C.'s 2014 enrollment in the District. Nonetheless, the record demonstrates that the team incorporated input from the meeting, including adding autistic support and approximately six additional "specifically designed instruction" modules for M.C. *Id.* at 15.

19

The fact that M.C. was homeschooled also undercuts some of the criticism offered by Plaintiff's expert, Dr. Hurewitz.  For example, she criticized the IEP's failure to address how M.C.'s "problem behavior" affected his school progress, *see id.* at 16 (citing sources), without seeming to account for the District's lack of opportunity to observe him firsthand.  The District is also correct that Dr. Hurewitz's critique of the plan was at times overstated, in that some of the items she recommended were in fact already incorporated, such as chunking materials, use of visual strategies, and use of mnemonics.  *Id.* at 17.

The Hearing Officer also observed that the November 2017 independent evaluation (solicited by M.C.'s mother) and the December 2017 evaluation (solicited by the School District) had "much . . . in common in in terms of [M.C.'s] needs—a structured transition to school-based programming, academic support in reading and mathematics, emotional support and autism support needs, with special attention paid to [M.C.'s] involvement in noisy or crowded environments."  Hearing Officer Decision, at 14.  Further, during the evaluation period, it seemed clear to all parties that M.C.'s mother intended to continue homeschooling M.C.  As the Hearing Officer observed, "even the November 2017 independent report [was] clearly geared to [M.C.] continuing in the community-based homeschooling program . . . not for transitioning [M.C.] expeditiously to District programming."  *Id.* at 13 n.6.

In order to have the fullest possible record, I granted Plaintiff's motion to supplement the record, and heard testimony from M.C.'s mother.  She is a talented and dedicated advocate for her son, but as impressed as I was by her knowledge and commitment, her testimony did not lead me to conclude that the Hearing Officer was incorrect in his determination of the facts, or his application of the law.  Keeping in mind the modified standard of review, I do not see a basis for granting Plaintiff's appeal.

**IV.    Section 504**

Because "[t]he claims in this case made under § 504 are parallel to the IDEA claims,"

that is, because both claims concern the School District's alleged denial of FAPE, resolution of

the IDEA issue also resolves the Section 504 issue.  *See P.P.*, 585 F.3d at 730.

**V.    Conclusion**

For the reasons set forth above, Plaintiff's Motion will be denied, and Defendant's

Motion will be granted.  An appropriate Order follows.


s/ Gerald Austin McHugh
United States District Judge